UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YAN BARSHAY, | |
| Plaintiff, | |
| -v.- | |
| MAHESH NAITHANI, | |
| Defendant. | |

20 Civ. 8579 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

In an Opinion and Order dated January 18, 2022, this Court dismissed the operative complaint in full but granted Plaintiff Yan Barshay ("Plaintiff") leave to replead his breach of contract claim against Defendant Mahesh Naithani ("Defendant").  *See Barshay* v. *Naithani*, No. 20 Civ. 8579 (KPF), 2022 WL 170599 (S.D.N.Y. Jan. 18, 2022) ("*Barshay I*").  Now before the Court is Defendant's motion to dismiss Plaintiff's Second Amended Complaint (or "SAC").  Because Plaintiff's breach of contract claim is barred by the terms of a release that he signed, and because the SAC fails in any event to cure the deficiencies identified by the Court in *Barshay I*, the Court grants Defendant's motion to dismiss the SAC.

**BACKGROUND**[1]

**A.    Factual Background**

The Court assumes familiarity with the facts, allegations, and procedural history of this case, all of which are recounted at length in *Barshay I*.  The Court recounts only the allegations necessary to resolve the instant motion.

---

[1]    This Opinion draws its facts primarily from the Second Amended Complaint (Dkt. #29 ("SAC")), the well-pleaded allegations of which are taken as true for the purposes of this

### 1.    The Oral Agreement

Plaintiff and Defendant have conducted business together since at least 2000, when they began working together at Ibex Telecom, a New York telephone card business.  (SAC ¶ 11).  That year, Plaintiff assisted Defendant in obtaining a $100,000 loan from Alexander Narod and Val Napadov, two of Plaintiff's friends.  (*Id.* ¶ 12).  Defendant used this money to keep Ibex Telecom afloat during a period when the business was experiencing cash flow problems.  (*Id.*).  The loan carried a high interest rate, and by late March 2003, the lenders were pressuring Plaintiff to settle the loan on Defendant's behalf.  (*Id.* ¶ 13).  Defendant could not personally pay back the loan, and Plaintiff ultimately paid the loan's principal balance at Defendant's request on April 3, 2003.  (*Id.* ¶ 14).

Concurrent with the loan's repayment, Plaintiff and Defendant entered into an oral agreement whereby "the parties agreed [D]efendant would repay the entire $100,000.00 amount together with interest … at the rate of ten percent [] per annum on a compounded basis until the loan's principal and its accruing interest were paid in full" (the "Oral Agreement").  (SAC ¶ 15).  According to the SAC, the parties did not discuss a repayment date at the time

---

Opinion.  The Court sources additional facts from Defendant's March 11, 2021 declaration and attached exhibits (Dkt. #16 ("Naithani Decl.")); Plaintiff's April 5, 2021 declaration and attached exhibits (Dkt. #19 ("Barshay First MTD Decl.")); and Exhibit 21 to Plaintiff's June 6, 2022 affidavit (Dkt. #44-2 ("Barshay Second MTD Decl., Ex. 21")).  The Court discusses the propriety of considering certain of the exhibits and information contained in Plaintiff's declarations later in this Opinion.

For ease of reference, the Court refers to Defendant's memorandum of law in support of his motion to dismiss as "Def. Br." (Dkt. #43); to Plaintiff's memorandum of law in opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #44); and to Defendant's reply memorandum as "Def. Reply" (Dkt. #45).

they entered into the Oral Agreement. (*Id.* ¶¶ 15-16). Instead, over the next two years, the parties periodically discussed Defendant's repayment of the loan principal and interest. (*Id.* ¶ 16). Plaintiff avers that Defendant initially promised to repay the loan following the sale of Ibex Telecom. (*Id.*). Defendant and Ibex Telecom, however, subsequently filed for bankruptcy in December 2004. (*Id.* ¶¶ 17, 19).

Prior to the bankruptcy filing, in November 2004, Defendant asked Plaintiff to create a Delaware limited liability company called Medimeme LLC ("Medimeme"). (SAC ¶ 20). Defendant directed Plaintiff to list Defendant's wife as the sole member of Medimeme, and offered Plaintiff a four percent equity stake in the entity. (*Id.*). Medimeme, which was subsequently renamed Medmeme LLC ("Medmeme"), served as a data provider in the pharmaceutical industry. (*Id.*). Plaintiff assisted Defendant with various projects to get Medmeme, as well as its wholly-owned subsidiary Pharmaspectra LLC ("Pharmaspectra"), off the ground, including obtaining lines of credit. (*Id.* ¶ 21). Plaintiff worked at Medmeme from its inception in 2004 through its sale in October 2019, during which time he claims to have "often brought up the repayment of the outstanding loan and accruing interest with [D]efendant promising it would be repaid as soon as" Medmeme generated positive cash flow. (*Id.* ¶ 23).

Consistent with the alleged Oral Agreement, Defendant made certain payments to Plaintiff. On October 15, 2016, Defendant issued a check from Medmeme's account to Plaintiff for $90,000. (SAC ¶ 24). "Loan" is written on

the check's memo line.  (*Id.*).  Plaintiff claims that he was owed $345,227.12 in interest at the time the check was issued; thus, prior to the $90,000 payment, Plaintiff was owed a total of $445,227.12.  (*Id.*).  Thereafter, Plaintiff also claims that Defendant "acknowledged his remaining debt to [P]laintiff ... on numerous occasions[.]" (*Id.* ¶ 25).  This includes a second payment to Plaintiff in the form of a $50,000 check from Medmeme's account on January 18, 2018.  (*Id.*).  Like the 2016 check, written on the memo line is "Loan[.]" (*Id.*).  From October 15, 2016, to January 18, 2018, Plaintiff claims that an additional $44,945 accrued in interest.  (*Id.* ¶ 26).  Thus, Plaintiff states that Defendant owed $400,172.12 to Plaintiff by January 18, 2018.  (*Id.*).

Despite the fact that Defendant allegedly owed Plaintiff $350,172.72 even after his $50,000 payment on January 18, 2018, Plaintiff claims that the parties made a new agreement that same day whereby Plaintiff agreed to take a haircut in order to resolve Defendant's debt.  (SAC ¶ 27).  According to Plaintiff, "on January 18, 2018[,] the parties orally agree[d] that the final payment to [P]laintiff will be $250,000, comprising accrued interest, which will be paid upon the sale of Medmeme." (*Id.*).

Thereafter, the parties worked to sell Medmeme and Pharmaspectra. Plaintiff states that he assisted with the sale and its due diligence, including by traveling to India to provide materials to a prospective buyer.  (SAC ¶ 28). Plaintiff also worked with Medmeme's legal counsel, Anjali Vorha ("Vorha"), in conjunction with the sale of the companies.  (*Id.*).  Plaintiff avers that by working with Vorha, he was assured that "all reasonable efforts are being made

in order for the sale to go forward so that proceeds from Medmeme's sale will pay [P]laintiff as a minority owner and settle [D]efendant's accrued loan interest obligation." (*Id.*). Inflexion Private Equity Partners ("Inflexion") was ultimately identified as a buyer for Medmeme; on May 3, 2019, Inflexion representatives met with Medmeme and Pharmaspectra representatives — including Plaintiff; the companies' accountant, Rellie Seville; Pharmaspectra CEO Jez Moulding; and Vorha — at Medmeme's New York office. (*Id.* ¶ 29). There, Plaintiff requested that Defendant's $250,000 debt be added to Medmeme's liabilities. (*Id.* ¶ 30). Vorha, after conferring with Defendant, explained to Plaintiff that such personal debt could not be added to Medmeme's liabilities, but that the debt "will be paid by [D]efendant shortly after the closing." (*Id.*).

### 2. The Releases

The sale of Medmeme closed on October 4, 2019. (SAC ¶ 31). Plaintiff avers that in connection with the closing, he received $506,323.22 as an equity distribution. (*Id.* ¶ 33). He also states that he received $1,100 in reimbursement for certain expenses he took on for the company. (*Id.*). Finally, Medmeme paid out salary arrears to Plaintiff on October 17 and 24, 2019. (*Id.*).

Plaintiff alleges that in connection with these payments, Plaintiff was required to execute two separate releases. (SAC ¶ 34). The first of these releases is titled "Confidential Settlement Agreement and General Release." (Naithani Decl., Ex. A ("Confidential Settlement Agreement")). This document states that "[t]he parties to this Agreement are Yan Barshay, the Employee …

and your Employers, Pharmaspectra LLC … and Medmeme LLC … (collectively, the 'Employer')." (*Id.* ¶ 1). There are various indicia that this document pertains solely to Plaintiff's employment. For example, it discusses the end of Plaintiff's employment, the termination of the employment agreement, and separation pay. (*Id.* ¶¶ 2-4). Further, it contains a general release, which states:

> You release the Employer … from all claims of any type to date, known or unknown, suspected or unsuspected, arising out of anything to do with your employment, the end of your employment, or any other matter.

(*Id.* ¶ 6). The release goes on to list exemplary claims that Plaintiff would give up by signing, including a variety of employment-related claims (*e.g.*, Fair Labor Standards Act ("FLSA") claims, violations of employment contracts, tort claims, and discrimination claims). (*Id.*). The document instructs Plaintiff to consult with an attorney prior to signing (*id.* ¶ 22); however, Plaintiff avers that he did not have an opportunity to review the document prior to the date of the closing, and thus did not consult with a lawyer prior to signing (SAC ¶ 34). The document is signed by both Plaintiff and Defendant, the latter in his capacity as President of Medmeme and Pharmaspectra, with a date of October 4, 2019.

The second of these releases is simply titled "Release." (Naithani Decl., Ex. B ("Release")). Its full text reads:

> In consideration of full payment by Medmeme LLC …, Pharmaspectra LLC …, Medical Intelligence Solutions LLC …, and Mahesh Naithani, an individual (collectively, the 'Borrowers'), in the amount of One

> Thousand One Hundred Dollars ($1,100) on the date set
> forth above, I, Yan Barshay, referred to as the Lender,
> release and discharge the Borrowers from any claims,
> liabilities, or obligations of the Borrowers to the Lender.

(*Id.*).  The document is dated October 4, 2019, but Plaintiff's signature is dated

October 10, 2019.  (*Id.*).  Plaintiff asserts that the Release "pertains to an

expense reimbursement connected to [P]laintiff's employment[,]" and that it

was signed contemporaneously with the "Confidential Settlement Agreement

and General Release[,]" thereby suggesting that "its nature and purpose [were]

connected directly to [P]laintiff's employment."  (SAC ¶ 36).  Like the

Confidential Settlement Agreement, the Release "contains no reference for

[P]laintiff to release [D]efendant from paying the $250,000 owed by him

personally to [P]laintiff."  (*Id.*).  Plaintiff claims that he did not have a lawyer

present when he signed the Release, and that he was not told to have a lawyer

present.  (*Id.*).

### 3.    The Parties' Post-Sale Communications

Following the sale of Medmeme and Plaintiff's execution of the two

releases, the parties continued to communicate with one another.  Plaintiff

claims that the parties met in person on October 14, 2019, and that Defendant

reassured Plaintiff that he would pay the $250,000 "as soon as he receives his

initial proceeds from the sale[.]"  (SAC ¶ 38).  Plaintiff alleges that "[w]ith these

assurances, [D]efendant reaffirm[ed] the parties' agreement made on

January 18, 2018."  (*Id.*).

Thereafter, the parties communicated through a series of emails,

beginning on October 30, 2019.  (SAC ¶ 39; Barshay First MTD Decl., Ex. 10).

In the initial October 30 email, Plaintiff thanked Defendant for meeting with him and "agreeing to repay the remainder of the $100,000 plus interest that I loaned you back in 2000." (SAC ¶ 39; Barshay First MTD Decl., Ex. 10). Plaintiff continued: "Last summer you stated that you would pay me $300,000 of which you already paid $50,000, which brings the balance to $250,000." (SAC ¶ 39; Barshay First MTD Decl., Ex. 10). Defendant replied that same day, and stated that "[i]n my books I have paid you $140k and car and car related payments." (SAC ¶ 40; Barshay First MTD Decl., Ex. 11). Although Defendant stated that he "will calculate all this and figure out the rest of [the] payments[,]" he disputed that there would be a payment of $300,000, and instead clarified that he recalled Plaintiff asking for that amount of money for Defendant to become a partner in a real estate venture. (SAC ¶ 40; Barshay First MTD Decl., Ex. 11). Defendant stated that he was not interested in such venture, and that he would "help [Plaintiff] out but never agreed to pay $300k." (SAC ¶ 40; Barshay First MTD Decl., Ex. 11). Defendant ended the message by stating that he would do final calculations and get his accountant involved. (SAC ¶ 40; Barshay First MTD Decl., Ex. 11). Plaintiff replied to this email the next day, stating that he trusted Defendant, which is why he never insisted "on any types of contracts between us[.]" (SAC ¶ 41; Barshay First MTD Decl., Ex. 11).

On November 15, 2019, Plaintiff followed up with Defendant, again by email. (SAC ¶ 42). Plaintiff noted that the "loan repayment topic" had become a "very urgent issue for me[,]" and inquired about the "calculations[.]" (*Id.*;

Barshay First MTD Decl., Ex. 12). Defendant responded thirty-five minutes later, and in pertinent part stated that "there is a[n] overpayment of approximately $1 million dollar[s] to other equity owners. Once all this is settled then I will be able to let you know about the payments." (SAC ¶ 42; Barshay First MTD Decl., Ex. 12). On November 26, 2019, Plaintiff emailed Defendant to request that consideration of the personal loan be separated from "Medmeme/Pharmaspectra business transactions." (SAC ¶ 43; Barshay First MTD Decl., Ex. 13). Plaintiff continued: "I loaned the money to you years before Medmeme was formed and it should not be mixed. That's why I never brought it up during the acquisition process and payment calculations, as I felt it had nothing to do with that business and it wouldn't be fair." (SAC ¶ 43; Barshay First MTD Decl., Ex. 13). Plaintiff then requested that the parties settle the repayment of the loan by the end of the month. (SAC ¶ 43; Barshay First MTD Decl., Ex. 13). Defendant responded on November 26, 2019, that "all the equity owners have been overpaid including you which I am waiting to settle." (SAC ¶ 43; Barshay First MTD Decl., Ex. 14). Once again, Defendant represented that he was working to "finalize the numbers[.]" (SAC ¶ 43; Barshay First MTD Decl., Ex. 14).

About a month later, on December 16, 2019, Plaintiff sent another email. (SAC ¶ 44; Barshay First MTD Decl., Ex. 15). Plaintiff again insisted on payment, and noted that "[t]he funds that you borrowed from me was years before Medmeme was formed, and it was a personal loan that I gave to you to get you out of a jam." (SAC ¶ 44; Barshay First MTD Decl., Ex. 15). Plaintiff

then wrote that "[a]bout two years ago you valued the remaining debt at $300k." (SAC ¶ 44; Barshay First MTD Decl., Ex. 15). Following receipt of the two payments from Defendant, Plaintiff clarified that "the balance including principal of $250k I believe is appropriate." (SAC ¶ 44; Barshay First MTD Decl., Ex. 15). Two days later, Plaintiff followed up on this communication. (Barshay First MTD Decl., Ex. 16). Defendant responded that at "this point of time in overpayment you will owe me over $250k now. That means you will owe me [a] lot more th[a]n you and I agree on." (SAC ¶ 45; Barshay First MTD Decl., Ex. 16). Plaintiff responded that he will inquire further into the matter, and two days later responded, "I also don't understand how I will owe you over $250k in overpayment funds." (SAC ¶ 48; Barshay First MTD Decl., Ex. 17). In response, Defendant reiterated his view that Plaintiff had been overpaid. (SAC ¶ 49; Barshay First MTD Decl., Ex. 18).

On January 21, 2020, Plaintiff received a letter from the law firm of Seyfarth Shaw LLP with the title "Notice of Discretionary Equity Incentive Overpayment and Intent to Recoup Overpayment." (SAC ¶ 52; Barshay Second MTD Decl., Ex. 21). Plaintiff alleges that this letter "seeks the offset claimed by [D]efendant in his emails to [P]laintiff … and attempts to claw back $283,958.52 from the [P]laintiff[.]" (SAC ¶ 52). Although this letter does not refer to Defendant, Plaintiff nonetheless avers that the term "Sellers" as used throughout "clearly refer[s] to [D]efendant[.]" (*Id.*).

### 4.      The Alleged Breach

In line with the above factual allegations, Plaintiff posits three possible dates on which Defendant breached the Oral Agreement, each of which occurred — if at all — more than sixteen years after the Agreement was struck. *First*, Plaintiff alleges that Defendant breached the Oral Agreement by failing to repay Plaintiff concurrent with Medmeme's closing on October 4, 2019.  (SAC ¶ 57).  *Second*, Plaintiff alleges that Defendant breached the Oral Agreement on November 15, 2019, which he posits to be "a commercially reasonable time" following Medmeme's sale.  (*Id.* ¶ 59).  *Third*, Plaintiff alleges that Defendant "repudiated" the Oral Agreement on December 18, 2019, when Defendant claimed that due to an "overpayment," Plaintiff owed Defendant more than $250,000.  (*Id.* ¶ 60).  "By seeking a set off" in so emailing him, Plaintiff alleges that "[D]efendant acknowledge[d] his debt and clearly show[ed] that he has no intention of paying what the parties had agreed to on January 18, 2018."  (*Id.*).

## B.      Procedural Background

Following the Court's decision in *Barshay I* dismissing this case with leave to replead the breach of contract claim, Plaintiff filed a letter on February 8, 2022, indicating that he wished to file the SAC.  (Dkt. #25).  The Court held a conference with the parties on February 15, 2022, during which conference the parties discussed the SAC and whether Defendant intended to file a second motion to dismiss.  (Dkt. #30).  Following this conference, the Court granted Plaintiff's request to file the SAC, directed Plaintiff to do so by March 9, 2022, and directed Defendant to file a letter by March 23, 2022,

indicating whether he intended to move to dismiss the SAC.  (Dkt. #27).

Plaintiff filed the SAC on March 10, 2022.  (Dkt. #29).  On March 23, 2022,

Defendant filed a letter previewing his second motion to dismiss this case.

(Dkt. #32).  The Court endorsed Defendant's letter and set a briefing schedule

for Defendant's contemplated motion.  (Dkt. #33).

On May 6, 2022, Defendant submitted his motion to dismiss the SAC

and supporting memorandum of law.  (Dkt. #42-43).  Plaintiff filed his

opposition memorandum of law and attached declaration and exhibit on

June 6, 2022.  (Dkt. #44).[2]  Finally, Defendant filed his reply memorandum of

law in support of his motion to dismiss on June 21, 2022.  (Dkt. #45).

Following the completion of briefing on the motion to dismiss, Defendant filed a

letter motion for leave to file a Rule 11 sanctions motion against both Plaintiff

and his counsel on June 28, 2022.  (Dkt. #46).  Plaintiff responded on July 1,

2022, opposing Defendant's contemplated motion.  (Dkt. #48).  On July 13,

2022, the Court advised the parties that it would not consider any request for

sanctions until it resolved the second motion to dismiss.  (Dkt. #49).[3]

---

[2]     Plaintiff later notified the Court that two lines of the final page of his memorandum of
law were missing, and submitted a corrected version of that page.  (Dkt. #47).

[3]     Although the Court does not presently have a motion for sanctions before it, and thus
does not prejudge the matter, it writes here to communicate its skepticism that Rule 11
sanctions are warranted in this case.  As discussed later in this Opinion, though the
Court agrees with Defendant that the SAC contradicts certain allegations in Plaintiff's
prior pleadings, these contradictions do not bear on the Court's resolution of the instant
motion.  What is more, on the record currently before it, the Court does not believe that
Plaintiff's argument regarding the Release is patently frivolous or made in bad faith.

## DISCUSSION

**A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)**

### 1.    The Standard of Review

When considering a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), a court should "draw all reasonable inferences in [a]

[p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and

determine whether they plausibly give rise to an entitlement to relief." *Faber* v.

*Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks

and citation omitted).  "To survive a motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the

plausibility requirement "is not akin to a 'probability requirement' ... it asks for

more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

Toward that end, a plaintiff must provide more than "an unadorned, the-

defendant-unlawfully-harmed-me accusation."  *Id.*  Moreover, "[w]here a

complaint pleads facts that are 'merely consistent with' a defendant's liability,

it 'stops short of the line between possibility and plausibility of entitlement to

relief.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2.    Documents That May Be Considered in Resolving a Rule 12(b)(6) Motion

"In considering a motion to dismiss for failure to state a claim pursuant

to Rule 12(b)(6), a district court may consider the facts alleged in the

complaint, documents attached to the complaint as exhibits, and documents

13

incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States of America ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (May 2, 2022).  A document that is "integral" to the complaint may also be considered, though "[i]t must also be clear that there exist no material disputed issues of fact regarding the [document's] relevance," authenticity, and accuracy.  *See Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

A document or communication may be incorporated by reference where the plaintiff expressly refers to the document or communication or otherwise relies on it in his pleadings.  *See, e.g.*, *DiFolco*, 622 F.3d at 112 (finding complaint incorporated by reference emails where plaintiff "referred in her complaint to [the] e-mails"); *Worldwide Servs.* v. *Bombardier Aero. Corp.*, No. 14 Civ. 7343 (ER), 2015 WL 5671724, at *8 (S.D.N.Y. Sept. 22, 2015) (finding emails incorporated by reference in complaint because "documents [were] clearly referenced by the [c]omplaint" and "highly relevant"); *Advanced Marine Techs., Inc.* v. *Burnham Sec., Inc.*, 16 F. Supp. 2d 375, 378 (S.D.N.Y. 1998) (considering entirety of letter heavily quoted from in complaint).  A document is "integral" to the complaint "where the complaint relies heavily upon its terms and effect."  *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted)).  "In most instances where this exception is

14

recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason — usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim — was not attached to the complaint." *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citing *Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 196-97 (2d Cir. 2005)); *see also, e.g.*, *Abdou* v. *Mahany*, No. 19 Civ. 1824 (PAE), 2021 WL 2650069, at *1 n.1 (S.D.N.Y. June 28, 2021) (considering settlement agreement on motion to dismiss because "the SAC relies on the terms and effect of the" settlement, and it "was clearly before [plaintiff] when drafting the SAC"). In reviewing an integral document, courts "are not constrained to accept the allegations of the complaint in respect of the construction of" the document, but courts should still "strive to resolve any contractual ambiguities in [the plaintiff's] favor." *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

In *Barshay I*, this Court declined to consider certain documents extrinsic to the complaint that the parties submitted in connection with their briefing on the first motion to dismiss, including the Confidential Settlement Agreement and the Release. 2022 WL 170599, at *5. However, the SAC quotes from or otherwise extensively relies on email exchanges between the parties, the releases, and the January 21, 2020 letter from Seyfarth Shaw LLP to Plaintiff. (*See, e.g.*, SAC ¶¶ 34-36 (discussing and quoting from the releases), 39-50 (same, with regard to the post-closing email exchanges), 52 (same, with regard

to the January 21, 2020 letter)).[4]  These documents were previously before the Court when submitted in connection with the first motion to dismiss; however, the prior complaint did not necessarily incorporate all of the documents. *Barshay I*, 2022 WL 170599, at *5.  In light of the SAC's extensive reliance on these documents, it is appropriate for the Court to consider them on this second motion to dismiss.  However, the Court disregards the factual assertions in Plaintiff's affidavit submitted with his memorandum of law in opposition to Defendant's motion to dismiss the SAC.  (Dkt. #44).  The law is clear that "[a] complaint cannot be modified by a party's affidavit or by papers filed in response to a dispositive motion to dismiss or for summary judgment." *Streit* v. *Bushnell*, 424 F. Supp. 2d 633, 639 n.3 (S.D.N.Y. 2006) (citing *Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *see also, e.g.*, *Brownstone Inv. Grp., LLC.* v. *Levey*, 468 F. Supp. 2d 654, 660 (S.D.N.Y. 2007) (same).

## B.      The Court Grants Defendant's Motion to Dismiss the SAC

### 1.      The Release Bars Plaintiff's Breach of Contract Claim

The Court first considers the impact of the signed Release on Plaintiff's breach of contract claim.  Defendant argues that "[b]y its plain terms, the Loan Release reflects Plaintiff's unequivocal agreement to discharge Defendant, in his individual capacity and as a borrower, from '*any* claims, liabilities, or obligations' owed to Plaintiff."  (Def. Br. 11 (quoting Release) (emphasis in

---

[4]      Defendant urges the Court to disregard the January 21, 2020 letter.  Though the Court does not find the letter relevant to its analysis in this Opinion, it sees no reason to disregard it, as it has similarly been incorporated into the SAC.

Defendant's brief)).  In support, Defendant observes that the Release's language is exceedingly broad, and that Plaintiff's attempts to cabin its scope by pleading that the Release pertains only to a "single expense reimbursement" are belied by the Release's plain language.  (Def. Br. 12).  Because the Release's language is clear and unambiguous, Defendant argues, this Court should not consider evidence outside of its four corners, including the parties' "post-agreement communications[.]"  (*Id.* at 12-14).

Plaintiff counters that the fact that the Release was signed contemporaneously with the Confidential Settlement Agreement is "an obvious tipoff indicat[ing] the Release is connected to [the Medmeme closing] and the ceasing of [P]laintiff's employment at Medmeme."  (Pl. Opp. 6).  In furtherance of this argument that the Release, despite its plain terms, does not apply to the Oral Agreement at the heart of this dispute, Plaintiff urges the Court to consider "New York's special rules regarding releases."  (*Id.* at 14).  Although Plaintiff provides almost no analysis as to how these "special rules" apply to the case at hand, the Court understands Plaintiff to be asking the Court to scrutinize the context in which the Release was signed, and to cabin its scope to employment-related issues.  (*Id.* at 14-16).

### a.   Applicable Law

A settlement agreement and release are contracts, and are thus construed according to general principles of contract law.  *See Collins* v. *Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002); *see also, e.g., Ladenburg Thalmann & Co.* v. *Imaging Diagnostic Sys., Inc.,* 176 F. Supp. 2d 199, 204

(S.D.N.Y. 2001) ("Under New York law, a release is governed by principles of contract law and a court should enforce a valid release by its clear terms." (internal citation omitted)).[5]   Under New York law, when a party disputes the meaning of particular contract clauses, the initial question for the court is whether the contract is unambiguous.  *Law Debenture Trust Co.* v. *Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010).  "Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence."  *RJE Corp.* v. *Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (internal quotation marks and citations omitted); *accord Chesapeake Energy Corp.* v. *Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113-14 (2d Cir. 2014); *see also Appel* v. *Ford Motor Co.*, 490 N.Y.S.2d 228, 229 (2d Dep't 1985) (where a valid release "is clear and unambiguous on its face" and is "knowingly and voluntarily entered into," it "will be enforced as a private agreement between [the] parties").

"Ambiguity is determined by looking within the four corners of the document, not to outside sources[.]"  *Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998); *accord Collins*, 303 F.3d at 433 ("Under New York law, the question of ambiguity *vel non* must be determined from the face of the agreement, without reference to extrinsic evidence.").  Contract language is not ambiguous where

---

[5]     The parties' briefing assumes that New York law controls this Court's consideration of the Oral Agreement as well as the Release, "and such 'implied consent … is sufficient to establish choice of law.'"  *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs* v. *Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).

"it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for difference of opinion.'" *JA Apparel Corp.* v. *Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Breed* v. *Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978)).  "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Hunt Ltd.* v. *Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).  Rather, a contract is ambiguous if the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement[.]" *Int'l Multifoods Corp.* v. *Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks and citations omitted).  Whether a written contract is ambiguous is a question of law for the court.  *Id.*

Resort to parol evidence or other extrinsic evidence — including "exchanges between the contracting parties during the course of negotiations, as well as post-execution conduct of the parties in performing the contract, admissions by the parties and[,] in appropriate circumstances[,] industry usage or practice" — is only permitted upon a finding of ambiguity in the contract in the first instance.  *See, e.g.*, *Fitzpatrick* v. *Am. Int'l Grp., Inc.*, No. 10 Civ. 142 (MHD), 2013 WL 5427883, at *3 (S.D.N.Y. Sept. 27, 2013) (citing, *inter alia*, *U.S. Fire Ins. Co.* v. *Gen. Reins. Corp.*, 949 F.2d 569, 571 (2d Cir. 1991) (noting that "the threshold question for us is whether the [insurance] policy is ambiguous" before resorting to parol evidence); *67 Wall St. Co.* v. *Franklin Nat'l*

19

*Bank*, 37 N.Y.2d 245, 248-49 (1975) ("[W]hile the parol evidence rule requires the exclusion of evidence of conversations, negotiations[,] and agreements made prior to or contemporaneous with the execution of a written lease which may tend to vary or contradict its terms, such proof is generally admissible to explain ambiguities therein[.]" (internal citation omitted))).[6]  Likewise, a court should not consider other extrinsic evidence, like the parties' "interpretation of the contract in practice, prior to litigation," *Ocean Transp., Inc.* v. *American Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984), absent a finding that a "contract term is ambiguous," *Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 796 (2d Cir. 2017); *accord Kinek* v. *Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994) (rejecting use of extrinsic evidence of parties' intent, including "the parties' understanding of the obligations imposed, as well as their conduct since then" because contract was unambiguous, and thus any facts about the parties' intent are immaterial), *as amended on denial of reh'g* (June 13, 1994); *Waterloo Cap. Partners, LLC* v. *BWX Ltd.*, No. 18 Civ. 6542 (RA), 2022 WL 2063762, at *13 (S.D.N.Y. June 8, 2022) (noting that courts may consider subsequent conduct of the parties to define ambiguous terms) (collecting cases); *cf. Kenyon & Kenyon LLP* v. *Sightsound Techs., LLC*, 163 N.Y.S.3d 510, 515 (1st Dep't 2015) (considering extrinsic evidence, including

---

6    Admittedly, courts interpreting New York law are not perfectly clear on the universe of evidence barred by the parol evidence rule.  For example, some courts consider post-agreement conduct to be parol evidence, whereas others consider such evidence to be simply "extrinsic."  Regardless, a court must make a threshold finding of ambiguity before resorting to either parol or extrinsic evidence.  *See, e.g.*, *Ames* v. *Cnty. of Monroe*, 80 N.Y.S.3d 774, 777 (4th Dep't 2018).

conduct of the parties following contract formation, after initially finding contract was ambiguous on relevant point), *leave to appeal denied sub nom. Kenyon & Kenyon LLP* v. *SightSound Tech., LLC*, 39 N.Y.3d 901 (2022).

With specific respect to releases, "[i]t is well established in New York that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between the parties." *Berman* v. *Parco*, 986 F. Supp. 195, 208 (S.D.N.Y. 1997) (internal quotation marks and citations omitted). And "[i]t is appropriate to grant a motion to dismiss on the basis of a binding release agreement where … the terms of the agreement are clear and unambiguous." *2 Broadway L.L.C.* v. *Credit Suisse First Boston Mortg. Cap. L.L.C.*, No. 00 Civ. 5773 (GEL), 2001 WL 410074, at *6 (S.D.N.Y. Apr. 23, 2001). Indeed, federal courts have "articulated a strong policy in favor of enforcing settlement agreements and releases." *Levine* v. *Bd. of Educ. of City of New York*, 152 F.3d 919, 1998 WL 386141, at *2 (2d Cir. May 21, 1998) (summary order).

"Although a defendant has the initial burden of establishing that it has been released from any claims, a signed release shifts the burden of going forward … to the [plaintiff] to show that there has been fraud, duress or some other fact which will be sufficient to void the release[.]" *Centro Empresarial Cempresa S.A.* v. *Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (internal quotation marks and citation omitted); *accord Interpharm Inc.*, v. *Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). Where a release is "clear and explicit, a court must enforce the agreement as written," and "[b]oth the

meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Mitsui O.S.K. Lines, Ltd.* v. *Archer-Daniels-Midland Co.*, No. 17 Civ. 5588 (JMF), 2018 WL 3946446, at *3 (S.D.N.Y. Aug. 16, 2018) (internal quotation marks and citation omitted) (applying Illinois law, but nonetheless noting that the relevant legal standards do not differ when considering admiralty or New York law).

That being said, while general releases are governed by contract law, "[their] interpretation and limitation by the parol evidence rule are subject to special rules ... based on a realistic recognition that releases contain standardized, even ritualistic[ ] language[.]" *Mangini* v. *McClurg*, 24 N.Y.2d 556, 562 (1969).  Accordingly, courts applying New York law have more carefully scrutinized the context and language used in releases to ascertain whether a given dispute or transaction falls within a given release's scope.  *Compare In re WorldCom, Inc.*, 296 B.R. 115, 123 (Bankr. S.D.N.Y. 2003) ("New York courts have recognized that under certain circumstances, broad releases may be avoided with respect to uncontemplated transactions.  However, the [r]elease contained in the [s]ettlement [a]greement specifically refers to 'all actions ... whether known or unknown,' thereby reflecting the clear and unambiguous intent of the [s]ettlement [p]arties to bar all uncontemplated transactions." (citing *Mangini*, 301 N.Y.S.2d at 513)), *with Campos* v. *Aegis Realty Mgmt. Corp.*, No. 19 Civ. 2856 (KPF), 2020 WL 433356, at *9 (S.D.N.Y. Jan. 28, 2020) ("On the record before it, the Court cannot find that [p]laintiff's claims were

contemplated by any of the parties to the [release] when the [bankruptcy p]lan was ordered by the [b]ankruptcy [c]ourt, making it less likely that such claims would be covered by the [release].").  Thus, even where a release employs broad language seemingly encompassing a claim, courts will "limit[] [it] to those claims within the contemplation of the parties at the time" as evidenced from the purpose for which the release was given and the context in which it was signed.  *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 69-71 (Bankr. S.D.N.Y. 2009) (surveying New York law).

Still, where a release's language is broad and nothing suggests it is inapplicable to the case at hand, courts will, in line with general contract principles, apply the release as written.  *See, e.g.*, *Jerry's Gen. Contracting Serv., Inc.* v. *Republic of Philippines*, No. 86 Civ. 3266 (PKL), 1987 WL 16369, at *3 & n.3 (S.D.N.Y. Aug. 21, 1987) (applying *Mangini*, and finding that broad release releasing defendant from "all manner of actions ... [plaintiff] ever had, now has or which it ... can ... have" was unambiguous and barred plaintiff's claim, despite parol evidence suggesting release was more limited in scope); *In re Kenston Mgmt. Co., Inc.*, 137 B.R. 100, 112 (Bankr. E.D.N.Y. 1992) ("This Court finds the [s]tipulation of [s]ettlement to be clear and unambiguous on its face, and accordingly, 'extrinsic (parol) evidence regarding the terms of the agreement is properly excluded in light of the absence of any ambiguity.'" (quoting *Sharma* v. *Skaarup Ship Mgt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990))).

### b.    Analysis

The plain, unambiguous language of the Release bars Plaintiff's claim, and provides sufficient grounds for dismissal of the SAC.  Again, the Court considers the Release's broad and plain terms:

> In consideration of full payment by Medmeme LLC ..., Pharmaspectra LLC ..., Medical Intelligence Solutions LLC ..., and Mahesh Naithani, an individual (collectively, the "Borrowers"), in the amount of One Thousand One Hundred Dollars ($1,100) on the date set forth above, I, Yan Barshay, referred to as the Lender, release and discharge the Borrowers from any claims, liabilities, or obligations of the Borrowers to the Lender.

(Release).  There is nothing ambiguous about the Release; despite its brevity, it releases Defendant and his associated entities, which it refers to as "Borrowers," from "*any* claims, liabilities, or obligations of the Borrowers to the Lender."  (*Id.* (emphasis added)).  By referring to Defendant and his entities as "Borrowers," the Release contemplates a loan of the sort in dispute in the instant case.

Courts applying New York law have enforced similarly broad releases on motions to dismiss where a plaintiff's claim fell within the plain and unambiguous terms of the release.  *See, e.g.*, *Matusovsky* v. *Merrill Lynch*, 186 F. Supp. 2d 397, 399 (S.D.N.Y. 2002) (finding plaintiff released employment discrimination claims against defendant based on release that stated it "applies to all claims resulting from anything which has happened up to now" and because "[w]ritten in plain English, the language of the [release] is clear and unambiguous"); *Muhammad* v. *Schriro*, No. 13 Civ. 1962 (PKC), 2014 WL 4652564, at *5 (S.D.N.Y. Sept. 18, 2014) (applying broad release signed prior to

lawsuit because "[t]he language of the [r]elease ... is unambiguous, and bars all claims arising out of past events" and dismissing case following conversion to motion for summary judgment); *Arzu* v. *City of New York*, No. 13 Civ. 5980 (RA), 2015 WL 4635602, at *4 (S.D.N.Y. Aug. 3, 2015) (same).  Without a finding of ambiguity in the first instance, the Court need not consider extrinsic evidence — including the parties' emails — outside the four corners of the Release, which by its own terms applies to "*any* claims" Plaintiff may have against Defendant.  *See, e.g.*, *Jerry's Gen. Contracting Serv., Inc.*, 1987 WL 16369, at *4 n.3 ("[P]laintiff also points to the check, issued on the same date as the release, as evidence of the parties' intent.... [H]owever, no evidence of intent can be used to contradict the clear meaning of the release.").

Plaintiff has not argued that the Release is ambiguous such that the Court should consider parol or extrinsic evidence to aid in its interpretation. Instead, Plaintiff argues that the unambiguous language of the Release supports his legal positions.  In the SAC, Plaintiff argues that the Release pertains solely to Plaintiff's employment with Defendant and not to the loan reflected in the Oral Argument, because it was signed contemporaneously with Medmeme's sale and the Confidential Settlement Agreement.  (SAC ¶ 36; Pl. Opp. 6).  In his opposition papers, Plaintiff adds that New York's "special rules" regarding interpretation of releases limit the scope of the Release to employment-related matters between and among Plaintiff, Defendant, and Defendant's former corporate entities.  (Pl. Opp. 14-16).  As detailed in the

remainder of this section, neither of these arguments saves Plaintiff's breach of contract claim from the plain language of the Release.

As to Plaintiff's first argument, the mere assertion in the SAC that the Release does not otherwise encompass Plaintiff's breach of contract claim despite its plain terms does not suffice.  Indeed, because the Court's task is to discern the parties' intent from the unambiguous language of the Release, Plaintiff's personal understanding of the Release does not control.  *See, e.g.*, *Borden* v. *City of New York*, No. 16 Civ. 716 (GHW), 2017 WL 744593, at *4 (S.D.N.Y. Feb. 24, 2017) ("To the extent that [plaintiff's] amended complaint alleges that he understood the release to only bar claims for lost wages, the unambiguous language of the release, rather than [his] subjective understanding, controls." (internal citation omitted)); *accord HOP Energy, L.L.C.* v. *Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012) ("With unambiguous contracts, a party's subjective intent and understanding of the terms is irrelevant.").  By its own terms, the Release is not limited to Plaintiff's employment, and the fact that it does not directly reference the Oral Agreement or loan is irrelevant, given its all-encompassing terms.

Nor do New York's "special rules" serve to artificially limit the Release's scope here.  As previously noted, these rules are designed to avoid barring a claim that was not contemplated by the parties where a release employs broad language that would cover the subject claim.  *See, e.g.*, *Enock* v. *Nat'l Westminster Bankcorp, Inc.*, 641 N.Y.S.2d 27, 28 (1st Dep't 1996) ("A release may not be read to cover matters which the parties did not desire or intend to

dispose of[.]" (internal quotation marks and citations omitted)).  Yet two facts cut against Plaintiff on this point.  *First*, Plaintiff *was* aware of the outstanding loan and the parties' Oral Agreement when he signed the Release.  (Def. Reply 6-7).  Indeed, by Plaintiff's own allegations, the parties' new agreement that Defendant would pay the outstanding interest on the loan concurrent with Medmeme's sale was made on January 18, 2018.  (SAC ¶ 27).  The sale of Medmeme closed on October 4, 2019 (*id.* ¶ 31), and the Release is dated that same day and was signed by Plaintiff six days later (Release).  As such, Plaintiff's core allegation in the SAC — that Defendant was due to pay on the Oral Agreement when Medmeme was sold — coincides with the precise timing that Plaintiff entered into the Release covering "any claims" that he might have against Defendant and his entities.  (Def. Reply 5-6).  This alone provides substantial context relating to the Release's purpose.

Because Plaintiff was aware of his potential claim under the Oral Agreement, the principal concern underlying the cases on which Plaintiff relies — that a given claim is not within the scope of a general release — is not implicated here.  For example, in *Cahill* v. *Regan*, the New York Court of Appeals found that a general release signed in the context of a replevin action did not bar a patent action, despite the release's broad language "extinguish[ing] any and all rights and claims[.]"  5 N.Y.2d 292, 299 (1959).  Because the replevin action was resolved and the general release signed more than a year prior to the patent even being issued, the court found that the release "covered and barred only those matters about which there had been

some dispute [at the time of the release's execution], not a possible future claim by the employer that he owned the patent or had a shop right to practice the inventions." *Id.* at 299-300 (internal citation omitted). Similarly, in *Mangini*, the New York Court of Appeals limited a general release ostensibly covering the plaintiff's claim because the plaintiff's injury was unknown and undiscoverable at the time she signed the release. 24 N.Y.2d at 561-62. At the time the plaintiff signed the release, she had only suffered minor injuries due to a car accident; however, some six months later, the plaintiff developed a severe hip condition that was unknown, and unknowable, at the time she signed the release. *Id.* Because the parties did not intend for the release to apply to this later-developed injury, the court found that "[d]espite the standardized language of the releases, the releasors are entitled to prove, directly or circumstantially, that there was no intention to release a claim for unknown injuries." *Id.* at 569.[7]

---

[7]   This case is likewise distinct from this Court's decision in *Campos* v. *Aegis Realty Management Corp.*, No. 19 Civ. 2856 (KPF), 2020 WL 433356 (S.D.N.Y. Jan. 28, 2020). In *Campos*, this Court considered whether a bankruptcy court's order releasing third parties from liability barred a plaintiff's FLSA claims in in an unrelated civil action. *Id.* at *1. By its plain terms, the third-party release appeared to cover plaintiff's claims. *Id.* at *8. However, because of the context in which the third-party release was ordered — an unrelated bankruptcy proceeding — this Court found that factual issues existed as to the release's intended scope. *Id.* at *9-10 ("The Court is left with conflicting evidence regarding the scope of the Third-Party Release: the terms of the provision imply that Plaintiff's claims would be included within the scope of the Release, while the context in which the Release was entered suggests that the claims were not released. In light of this conflict, the Court cannot determine that the Third-Party Release unambiguously includes Plaintiff's claims within its scope."). Those same concerns do not exist here: the Release was signed when Defendant's performance was allegedly due under the 2018 agreement; it was entered into by the two parties presently before the Court in this breach of contract action; and the separate Confidential Settlement Agreement plainly covers employment-related claims that Plaintiff may have brought against Defendant.

The cases cited by Plaintiff are simply inapposite to the instant case. According to the allegations in the SAC, (i) the parties entered into the Oral Agreement in 2003; (ii) the parties separately agreed in 2018 that Defendant would perform his end of the Oral Agreement concurrent with Medmeme's sale; and (iii) Plaintiff signed the Release concurrent with both Medmeme's sale and Defendant's time for performance.  Clearly, Plaintiff's claim for breach of the Oral Agreement was known at the time Plaintiff signed the Release; based on the broad and unambiguous language of the Release, the Court harbors no doubt that Plaintiff's breach of contract claim falls within its scope, even if Plaintiff were to subjectively believe that it does not.

*Second*, contrary to Plaintiff's argument that the Release's close temporal relationship to the Confidential Settlement Agreement somehow limits the Release's scope, this Court finds that such fact evinces the opposite.  (Pl. Opp. 6-7).  In essence, Plaintiff's argument is that, applying New York's rules regarding interpretation of releases, the context of when the Release was executed between the parties — including the fact that the parties executed the Confidential Settlement Agreement at or near the same time and that both releases were executed concurrent with Medmeme's closing — clearly shows that the Release pertains only to employment-related disputes.[8]  But the

---

[8]     In a similar vein, Plaintiff cites to New York cases propounding the common-sense principle that contracts are interpreted as a whole, including when an entire contract spans multiple writings.  (Pl. Opp. 15).  These cases are entirely inapposite.  For example, in *Nau* v. *Vulcan Rail & Construction Co.*, the New York Court of Appeals found that it was necessary to consider multiple writings — including a contract between the defendant and the City of New York — that were referred to in a final writing between the defendant and plaintiff.  286 N.Y. 188, 197 (1941).  The court found that because "[a]ll three instruments were executed at substantially the same time, related to the

Confidential Settlement Agreement seeks to resolve the parties' employment-related issues, whereas the Release makes no mention of Plaintiff's employment.  For example, the Confidential Settlement Agreement contains its own "General Release," which notes that Plaintiff releases "all claims of any type to date, known or unknown, suspected or unsuspected, arising out of anything to do with your employment, the end of your employment, or any other matter."  (Confidential Settlement Agreement ¶ 6).  And while Plaintiff pleads that the Release "pertains to an expense reimbursement connected to [P]laintiff's employment" (SAC ¶ 36), the Confidential Settlement Agreement's terms specifically apply to that issue (Confidential Settlement Agreement ¶ 6 ("This means you give up all claims for … any pay, compensation, or benefits … including bonuses, commissions, equity, *expenses*, incentives, insurance, paid/unpaid leave, profit sharing, or separation pay/benefits[.]" (emphasis added)); *id.* ¶ 22 ("You agree You have received all … expense reimbursements you are due to date[.]")).  Finally, the Confidential Settlement Agreement notes that "[t]his [a]greement is the complete understanding between you and the

---

same subject-matter, [and] were contemporaneous writings[,] [they] must be read together as one."  *Id.* (internal citations omitted).  The Second Circuit's decision in *This is Me, Inc.* v. *Taylor*, discusses the same rule.  157 F.3d 139, 143 (2d Cir. 1998) ("We conclude that there was sufficient evidence — the drafting history and chronology, the cross-referencing of the agreements, the integral nature of the undertakings for the stage and video performance, the relationships among the producing parties and entities, and the background assumptions furnished by the Equity rules — for the jury, as properly instructed, to find that [defendants] were personally liable on the pay or play guarantee.").  But as discussed in this Opinion, the two releases concern different subject matters, use different terms, and address different obligations.  Temporal proximity alone does not compel the Court to read the two releases as one.

Employer.  It replaces any other agreements, representation or promises, written or oral."  (*Id.* ¶ 19).

The Release, on the other hand, refers to Defendant and his entities as "Borrowers."  (Release).  It makes no mention of expense reimbursements, unlike the Confidential Settlement Agreement, and makes no reference to the Confidential Settlement Agreement or Plaintiff's employment whatsoever.  (*Id.*).  Its release terms are not limited to claims "arising out of ... [Plaintiff's] employment" (Confidential Settlement Agreement ¶ 6), but rather "any claims, liabilities, or obligations of the Borrowers to the Lender" (Release).  Although the Release is brief, these terms are distinct from those in the Confidential Settlement Agreement, and relate to a different subject matter broad enough to encompass Plaintiff's claim here.  In this respect, the Court agrees with Defendant's argument that because the Confidential Settlement Agreement and Release were presented to Plaintiff at the same time, and because the former clearly "dealt with the termination of Plaintiff's employment and the release of any claims related to it," limiting the Release to employment claims would render it "redundant and unnecessary."  (Def. Reply 8).  Indeed, Plaintiff's construction of the Release would render it entirely superfluous to the Confidential Settlement Agreement, contrary to clearly established contract law.  *See, e.g., Manley* v. *AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003) ("New York law ... disfavors interpretations that render contract provisions meaningless or superfluous."); *Georgia-Pacific Consumer Prods., LP* v. *Int'l Paper Co.*, 566 F. Supp. 2d 246, 251 (S.D.N.Y. 2008) ("[R]eading [an] entire

agreement, a court must strive to give full meaning and effect to all of its provisions.  It is a cardinal rule of construction that a court adopt an interpretation that renders no portion of a contract meaningless." (internal quotation marks and citations omitted)); *Fraternity Fund Ltd.* v. *Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 577 (S.D.N.Y. 2005) ("New York law prefers an interpretation of a contract that gives words and phrases full meaning and effect over one that renders them meaningless.").

Even considering the context in which it was entered, the plain and unambiguous terms of the Release bar Plaintiff's breach of contract claim against Defendant.  For this reason alone, the Court must grant Defendant's motion to dismiss the SAC.[9]

## 2.    Plaintiff Fails to Remedy the Issues Identified in *Barshay I* in the Second Amended Complaint Because Plaintiff Fails to Plead a Valid Novation

Even were the Court to disregard the Release, it would conclude that dismissal was warranted because Plaintiff has failed to remedy the defects identified by the Court in *Barshay I.*  In that earlier opinion, the Court noted that survival of Plaintiff's breach of contract claim would turn on whether Plaintiff "could plead additional facts that would warrant a finding that (i) the time for Defendant's performance has passed, or (ii) Defendant has repudiated

---

[9]    Plaintiff intimates both in his declaration (which this Court declines to consider) and in the SAC that this Court should view with skepticism both the Confidential Settlement Agreement and the Release because "[t]here was no lawyer present, nor was [P]laintiff told to have a lawyer of his own choosing" to review either of the releases.  (SAC ¶ 36). In his opposition submission, however, Plaintiff does not suggest that this fact voids the releases.  In any event, Plaintiff has not made a showing of any of the traditional bases for voiding a contract, such as duress.  *See, e.g.*, *Interpharm, Inc.* v. *Wells Fargo Bank, Nat'l Ass'n,* 655 F.3d 136, 142 (2d Cir. 2011).

his obligations under the agreement." *Barshay I*, 2022 WL 170599, at *9. The Court finds that Plaintiff has not adequately pleaded facts supporting either of these contentions in the SAC.

Even now, Plaintiff does not allege that the parties agreed to a date or deadline for repayment at the time of the Oral Agreement. Instead, the SAC realleges the same basic facts[10] about the Oral Agreement's inception: that the Oral Agreement was formed between the parties on April 3, 2003, that it was a fully oral contract, and that at the time that it was formed in 2003, there was no stated time for Defendant to pay back the relevant loan. (SAC ¶ 15). Recognizing the difficulties that inhere in a contract that specifies no time for performance, Plaintiff pleads in the SAC that concurrent with the January 18, 2018 check from Defendant to Plaintiff, "the parties orally agree[d] that the

---

[10]     One potentially relevant addition to the SAC is the allegation that Plaintiff and Defendant expressly agreed to a compounding ten percent interest rate at the inception of the Oral Agreement in 2003. (Def. Br. 4). To review, in the First Amended Complaint (or "FAC"), Plaintiff averred that "[t]he loan's accruing interest is calculated at 10% per annum," not because the parties had agreed to such a rate, but because that rate "is justified as a fair market rate[.]" (FAC ¶ 23 (Dkt. #12)). In the SAC, Plaintiff pleads instead that "the parties agreed [D]efendant would repay [the loan] … at the rate of ten percent (10%) per annum[.]" (SAC ¶ 15). This allegation plainly contradicts the allegation in the FAC, insofar as there would be no need to resort to a "fair market rate" in the FAC if the parties had expressly agreed to an interest rate. Though ordinarily an amended complaint "supercedes the original, and renders it of no legal effect," *Dluhos* v. *Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks and citation omitted), "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading[,]" *Underwood* v. *Coinbase Glob., Inc.*, No. 21 Civ. 8353 (PAE), 2023 WL 1431965, at *6 (S.D.N.Y. Feb. 1, 2023) (internal quotation marks and citations omitted). The Court agrees with Defendant that this allegation should be disregarded. As it happens, because the Court did not rely on the missing interest rate in *Barshay I* and does not now, this point is immaterial to the Court's analysis. Though the Court is cognizant that Plaintiff has advanced new, and at times contradictory, theories in the SAC, the Court will not disregard any other allegations in the SAC; it concludes that even with these allegations, the SAC fails to state a claim.

final payment to [P]laintiff will be $250,000, comprising accrued interest, which will be paid upon the sale of Medmeme." (*Id.* ¶ 27).

This Court previously found, applying the factors set forth in *Winston* v. *Mediafare Entertainment Corporation*, 777 F.2d 78 (2d Cir. 1985), that Plaintiff had "plausibly alleged the existence of a binding oral agreement," namely, the Oral Agreement allegedly formed in 2003. *Barshay I*, 2022 WL 170599 at *6. The SAC provides the Court with no reason to reconsider this finding, and both parties proceed from the premise that the Oral Agreement was formed in 2003. Instead, the parties disagree over the import of Plaintiff's new allegation that the parties entered into a second oral agreement in 2018 in which they set a date for performance concurrent with the sale of Medmeme.  Defendant argues that this allegation requires the Court to apply the *Winston* factors anew, and that none of those factors counsels in favor of finding a new agreement between the parties in 2018.  (Def. Br. 7-10).  Plaintiff does not specifically address Defendant's *Winston* argument; instead, Plaintiff spends the majority of his opposition arguing that a contract exists — something this Court already found.  (Pl. Opp. 1-4; 9-13).  Among other things, Plaintiff observes that "[r]egardless of whether it is 'new' or old, there is an agreement present between the parties." (*Id.* at 1).

At the outset, the Court agrees with Defendant that Plaintiff's allegation regarding an alleged 2018 agreement to supply a date for Defendant's performance requires the Court to find a new contract here.  According to Plaintiff's own allegations in the SAC, the parties effectively proceeded under

34

the 2003 Oral Agreement for fifteen years without that contract specifying a date for Defendant to pay back the loan.  (*Compare* SAC ¶ 15 (alleging the formation of the Oral Agreement in 2003, which did not specify a date for performance), *with id.* ¶ 27 (alleging that the parties did not agree on a date for performance until they formed a new contract, whereby Plaintiff agreed to "provide[] [D]efendant with a substantial discount of the accrued interest … which the [D]efendant accepts and agrees to pay in whole at the time of Medmeme's sale")).  Accepting Plaintiff's allegations, it was not until January 2018 that the parties orally agreed, via a novation, on a date for Defendant to pay back the loan: in essence, Plaintiff agreed to lower the amount due under the 2003 Oral Agreement in exchange for repayment of the loan concurrently with Medmeme's sale.[11]

Although the Court agrees with Defendant's main contention on this second motion to dismiss — that the 2018 agreement as alleged in the SAC is a new agreement — it finds that dismissal of the breach of contract claim is warranted for a reason much simpler than a fresh application of *Winston*. When this Court granted Plaintiff leave to amend in *Barshay I*, it did so under the assumption that Plaintiff would plead *something* allowing this Court to find that a key material term — the time for Defendant to pay back the loan — existed in the Oral Agreement, such that the Court could find that Plaintiff had

---

[11]     "Under New York law, 'a novation is a new contract replacing and extinguishing a prior contract.'"  *Donnenfeld* v. *Petro, Inc.*, 333 F. Supp. 3d 208, 217 (E.D.N.Y. 2018) (quoting *Gem Glob. Yield Fund, Ltd.* v. *Surgilight, Inc.*, No. 04 Civ. 4451 (KMK), 2006 WL 2389345, at *15 (S.D.N.Y. Aug. 17, 2006)).

adequately alleged a breach.  But, per Plaintiff's own allegations in the SAC, the parties did *not* agree on a date for Defendant to repay the loan under the 2003 Oral Agreement until they formed a novation in 2018.

"When a contract does not specify time of performance, the law implies a reasonable time."  *Savasta* v. *470 Newport Assocs.*, 82 N.Y.2d 763, 765 (1993). Ordinarily, what constitutes a "reasonable time" is a fact issue dependent upon the "circumstances of the particular case."  *Id.* (citing *Zev* v. *Merman*, 73 N.Y.2d 781, 783 (1988)).  That being said, in certain circumstances, courts applying New York law have found it appropriate to find that an unspecified, "reasonable time" for performance has passed as a matter of law.  *See, e.g.*, *Sutton* v. *Burdick*, 906 N.Y.S.2d 634, 636 (3d Dep't 2010) (finding breach of contract claim premised on breach of 1997 contract that failed to specify time for performance time-barred because claim for non-performance was not asserted for 12 years, and "[i]n the absence of any indication that performance was not possible in the immediate months and years following the agreement … [the] claim is now time-barred"); *Bainbridge-Wythe P'ship* v. *Niagara Falls Urb. Renewal Agency*, 742 N.Y.S.2d 176, 177 (4th Dep't 2002) (finding that district court properly granted summary judgment based on "determination that a reasonable time to enforce the contract had passed as a matter of law" where contract did not specify date for performance and seventeen years had passed).

A novation requires "[(i)] a previously valid obligation, [(ii)] agreement of the parties to the new obligation, [(iii)] extinguishment of the old [obligation], [(iv)] and a valid new contract."  *Arici* v. *Poma*, 163 N.Y.S.3d 521, 522 (1st Dep't

2022) (quoting *Warberg Opportunistic Trading Fund L.P.* v. *GeoResources, Inc.*, 58 N.Y.S.3d 1, 8 (1st Dep't 2017). "If a party breaches a preexisting contract, there can be no novation because the first element is negated." *Lambert* v. *Schiller*, 68 N.Y.S.3d 195, 197 (3d Dep't 2017) (citing *Wasserstrom* v. *Interstate Litho Corp.*, 495 N.Y.S.2d 217, 219 (2d Dep't 1985)). And like any contract, a novation requires consideration. *See, e.g.*, *Trans-Orient Marine Corp.* v. *Star Trading & Marine, Inc.*, 736 F. Supp. 1281, 1283 (S.D.N.Y. 1990), *aff'd*, 925 F.2d 566 (2d Cir. 1991).[12]

Plaintiff's novation theory proceeds from a fundamentally flawed premise. On Plaintiff's own allegations, the Oral Agreement existed for fifteen years without specifying any date for Defendant to perform his end of the bargain. Under the relevant law, Defendant was obligated to perform under the Oral Agreement within "a reasonable time." Though the Court need not discern the precise limits of such a period, fifteen years falls well outside a reasonable timeframe in the absence of the parties agreeing otherwise. In consequence, there was no valid obligation at the time the parties allegedly entered into the alleged novation in 2018, and *a fortiori* there could be no novation. Because

---

[12]   If this Court were to construe the 2018 oral agreement supplying the relevant date for Defendant's performance as a modification, its analysis would be essentially the same. *See, e.g.*, *Cohan* v. *Movtady*, 751 F. Supp. 2d 436, 442 (E.D.N.Y. 2010) ("To be enforceable, an oral modification must possess all of the elements necessary to form a contract, including valid consideration."); *see also, e.g.*, *O'Grady* v. *BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 502 (S.D.N.Y. 2015) ("To be valid, a contractual modification must satisfy each element of a contract, including offer, acceptance, and consideration."), *aff'd*, 646 F. App'x 2 (2d Cir. 2016) (summary order).

Plaintiff has not and cannot plead a breach of the Oral Agreement, the Court dismisses the SAC on this alternative basis.[13]

## CONCLUSION

For the reasons discussed in this Opinion, Defendant's motion to dismiss the SAC is GRANTED.  Because (i) Plaintiff has already amended the complaint in this case twice; (ii) Defendant has filed two successful motions to dismiss the operative complaint; and (iii) any amendment would be futile, particularly in light of the Release, the Court denies further leave to amend.  *See, e.g.*, *Bellocchio* v. *Garland*, No. 21 Civ. 3280 (KPF), 2022 WL 2702445, at *6 (S.D.N.Y. July 12, 2022) (collecting cases).  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      February 16, 2023
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

---

[13]      Likewise, Plaintiff cannot allege that there was an anticipatory repudiation of the Oral Agreement in the absence of a date for performance.  *See, e.g.*, *Art Works, Inc.* v. *Al-Hadid*, 176 N.Y.S.3d 607, 609 (1st Dep't 2022) ("The court properly dismissed plaintiff's claim for anticipatory breach of the agreement....  The complaint did not allege that any portion of the agreement was repudiated by defendant before the fixed time for performance arrived.").